## COWETA SUPERIOR COURT,

### March Term, 1842.

———

John L. Martin and Joseph Frost and Mary (his wife) vs. Gilbert D. Greer and Dempsey J. Connally, Executors of Hiram Buckley, dec'd.

*Bill for Relief, &c. in Coweta Superior Court, and Rule Nisi for new trial.*

1. An express trust in regard to personal property may be proved by parole evidence.

2. Property wrongfully purchased with the trust fund, may at the option of the *cestui que trust*, be pursued in the hands of the trustee, or those in privity with him, and held subject to the terms of the original trust.

3. An express trust against which the statute of limitations does not run, may be created by parole. The possession of the executors of a trustee, is the continuation of the trustee's possession, and the statute does not run in their favour.

4. If a trustee holds over, after the expiration of the trust, his possession is for the *cestui que trust*, and no bar is created in his favour.

5. The statute does not begin to run in favour of a trustee until his possession becomes adverse by a refusal to deliver the trust property, or an appropriation of it by him.

This is a bill filed by *John L. Martin*, who sues in his own right, and as the assignee of *Henry English*, who married *Catharine Martin*, *Jonathan Nutt*, who married *Eleanor Martin*, and *Morris Martin*, and *Joseph Frost* and his wife *Mary Frost*—in which it is alleged, that *John Langdon*, in the year 1801, loaned to his daughter, *Nancy Martin*, then a widow, and mother of the complainants, a negro woman by the name of *Nance*—that in the year 1802, the said *Nancy* intermarried with one *Hiram Buckley*, now deceased, and upon said marriage, the said *John Langdon*, by express agreement and contract, permitted the said negro woman, *Nance*, to

remain in the possession of the said *Hiram Buckley* and wife, expressly stipulating that she was to remain during the natural life of the said *Hiram* and wife, or either of them, and at the death of the survivor, the said negro woman and her increase was to become the property of the complainants, the children of the said *Nancy Martin*, by her former husband—that in the year 1807, the said *Hiram Buckley* being dissatisfied with the said negro woman, *Nance*, returned her to the said *John Langdon*, who, being anxious to make provision for his daughter and her children, furnished the said *Hiram Buckley* with the sum of $400 in cash, in lieu thereof, with express instructions, and which was received by the said *Hiram*, with the distinct and express understanding that he was to purchase therewith another negro woman slave in the place and stead of the said *Nance*, and which, with her increase, was to follow all the conditions in stipulations made concerning the said *Nance* at the time she was delivered to the said *Hiram* and wife, to wit : that she was to remain in their possession during the life of the survivor, and at the death of the survivor to become the property of the said children of the said *Nancy Martin*, the present complainants.    It is further stated, that the said *Hiram* kept the four hundred dollars in his possession for several years, and then purchased therewith a tract of land and took the title thereto in his own name—and that, in the year 1812, he exchanged the said tract of land for a negro woman slave by the name of *Jinny*, and her two children, *Bobb* and *Keziah*, and placed them in the place and stead of the said negro woman *Nance* and her increase, and to follow the conditions and stipulations made and entered into concerning the said *Nance* and her increase.   It is further stated, that the said *Hiram*, at the time he purchased the said negro woman *Jinny* and her children, although he then, and at all times afterwards during his life, admitted that the same were the proceeds of the said sum of $400, and that he and his wife had only a life estate in the same, and at their death the same with their increase were to become the property of complainants, yet the said *Hiram* took a bill of sale to said negro woman *Jinny* and her children in his own name. They further charge, that said *Hiram* received and held said negro woman *Jinny* and her increase in trust for the said complainants, and that the said negro woman *Jinny* and her children, at the time of the purchase, did not exceed in value the said *Nance* and her increase, and that the actual cost of the same did not exceed the

[Martin, Frost, &c. vs. Greer & Connally, Ex'ors.]

principal sum of $400 and the interest thereon, from the time the same was received by the said *Hiram* till the said purchase was made. It is also alleged, that the said *Hiram* and wife continued to live together until the year 1819, when the said *Nancy* died, leaving no issue except the said complainants, and that said *Hiram* continued in possession of said negroes until the —— day of July, 1831, when he died; having made a will and appointed the defendants his executors. That said negroes had increased to some eleven or twelve in number, and that they had been taken possession of by the said *Greer & Connally*, as executors, and that they were still in their possession. The bill then states the value of the negroes, and prays that defendants may be decreed to convey to them the negroes, and to account to them for the hire, &c. The defendants admit, by their answers, that *Buckley* did, in the year 1812, receive the said negro woman *Jinny* and her two children in exchange for a tract of land, from a man by the name of *William Pollard*, and that he took the bill of sale in his own name, as they contend he had a right to do. They deny any knowledge of all the facts and circumstances charged in said bill, which go to shew that *Buckley* had a life estate only, in said negroes, or that he held them in trust for said complainants, and contend that said negroes were *bona fide* the property of the said *Buckley*; and as a circumstance in confirmation of this fact, they attach to their answers a copy of the will of the said *Buckley*, by which he disposes of the said negroes as his own property. They admit that they, as the executors of said *Buckley*, took possession of said negroes immediately after his death, and have continued to hold and control them ever since. They also insist upon the statute of limitations, by which they contend the complainants' right of recovery is barred.

Upon the trial, most of the material allegations in the bill were supported by testimony: there was some conflict however between the testimony of complainants and defendants, with regard to the identity of the money with which *Buckley* paid for the land which he exchanged for *Jinny* and her children. The Jury found a verdict in favour of complainants, for the sum of seven thousand dollars, to be discharged by the delivery of the negroes, and also for the sum of $2557, as hire.

The defendant's counsel moved for a new trial, on the following grounds:

[Martin, Frost, &c. vs. Greer & Connally, Ex'ors.]

1st. Because the complainants on the trial of said cause, offered parole evidence to prove the trust set forth in their bill of complaint, which was objected to by defendants, on the ground that an express trust could not be proved by parole under the law, which objection was over-ruled by the Court, and the parole evidence admitted, on the ground that the trust alleged in the bill was an implied or resulting trust, and not an express trust.

2nd. Because the Court charged the Jury, that the statute of limitations did not commence running against the complainants, in favour of defendants, until the death of *Buckley,* which took place 15th July, 1831.

3rd. Because the Court charged the Jury, that the statute of limitations did not commence running against the complainants, in favour of defendants, until the time of the probate of the will of *Buckley,* by defendants.

4th. Because the Jury have returned a verdict in favor of *Joseph Frost* and wife, who have been made parties by amendment, who claim to be entitled to one-fifth of the property in controversy, without there being any evidence going to shew he had commenced any suit for his share of said property, against the defendants, until after the expiration of four years from the time of the probate of the will of said *Buckley,* so as to take the case out of the statute of limitations as to him.

5th. Because the defendants are sued by complainants as the executors of *Hiram Buckley,* deceased, and required to account for property held and possessed in their representative capacity, and the Jury have refused to allow them credit for their disbursements as rendered in their answer, which disbursements had been allowed and sanctioned by the Court of Ordinary of De Kalb County, and were not contradicted by any testimony.

6th. Because the Jury found contrary to Law and evidence.

These grounds will be considered in their order. As to the first, it is true that a motion was made at the trial, by defendants' counsel,

to reject the evidence offered by complainants, upon the ground that according to the allegations in the bill, an express trust was created, and that an express trust could not be proved by parole evidence.— The Court overruled the motion, and stated that it was of opinion, from the facts stated in the bill, that the trust was a resulting trust, and not an express trust, but the Court is now of opinion, that so far as this motion was concerned, it is not material whether this be considered as an express or implied trust, or a resulting trust, as the testimony would properly have been admitted to support either, that section of the Statute of Frauds and the other authorities relied on, not being considered as applicable to personal property.—See 2d vol. *Story's* Equity 235, and the case of *Benbow* vs. *Townsend,* 7th vol. Eng. Ch. Rep'ts 143. The Court is therefore of opinion, that it did not err in overruling this motion, whether this be considered as an express or resulting trust.

As to the second ground, the Court will remark, that it has been furnished by both of defendants' counsel with very able written arguments, in one of which the counsel has bestowed much labour on this branch of the case, for the purpose of establishing the position that *Buckley* did not have a life estate in the negro woman *Jinny* and her children, and that complainants could have commenced an action at Common Law against *Buckley,* for the recovery of the four hundred dollars, for his breach of trust, in not applying it in the manner directed, immediately upon their coming of age, and that having the right to sue for the four hundred dollars, and having failed to do so, their right to sue for the property purchased with the money was barred by the statute of limitations.

The counsel remarks in his argument, " that if the position assumed by the Court be true, that *Buckley* had a life estate in *Jinny* and her increase, and that the *Martin* children were seized of the property, as remainder men according to the rules of Law creating estates in remainder, then we admit, the statute did not commence running until the death of *Buckley.*" Let us then examine this question. An estate in remainder is defined to be "an estate limited to take effect and be enjoyed after another estate is determined."— 2nd *Blk.* Com. 164. There then must be a particular estate to support the estate in remainder, the remainder must commence or pass out of the grantor at the time of the creation of the particu-

o

lar estate, and the remainder must vest in the grantee during the continuance of the particular estate, or *eo instanti* that it determines." And an estate in remainder may be created in personal chattels as well as real."—Same authority 198.

The counsel asks "from whom, or by whom, has such an estate been created by *Jinny* and her increase in the *Martin* children? What grantor has conveyed *Jinny* and her increase to *Buckley* and wife during their lives, with remainder in fee to the *Martin* children? From what legal premises does the Court arrive at the conclusion that *Buckley* had a life estate only in *Jinny* and her increase?" The Court will endeavor to answer these interrogatories. In the first place, it will be recollected that it is alleged in the bill, which allegation is supported by proof, that in the year 1802, upon the intermarriage of *Buckley* with the widow *Martin*, *John Langdon*, the father of *Mrs. Martin*, delivered to *Buckley* and wife, the negro woman *Nance*, which was to remain in their possession during the life of the survivor, at whose death said negro and increase, was to become the property of the *Martin* children, that said negro remained in the possession of *Buckley* and wife, until the year 1807, when she was returned to *Langdon*, who furnished said *Buckley* with $400 in lieu thereof, which was to be vested in another negro woman in the place and stead of *Nance*, that the $400 was vested in a tract of land, and that in 1812, the land was exchanged for the negro woman *Jinny* and her two children, and placed in the place and stead of the said negro woman *Nance* and her increase, and to follow the conditions and stipulations made and entered into in relation to her. Now, it is a principle both of Law and Equity, "that whenever the property of a party has been wrongfully misapplied, or a trust fund has been wrongfully converted into another species of property, if its identity can be traced, it will be held in its new form liable to the rights of the original owner, or *cestui que trust*."—2d *Story's* Equity 502–3. The general proposition both at Law and in Equity upon this subject, is, that if any property in its original state and form, is converted with a trust in favour of the principal, no change of that state and form can divest it of such trust, or give the agent or trustee converting it, or those who represent him in right, (not being *bona fide* purchasers for a valuable consideration without notice) any more valid claim in respect to it, than they respectively had be-

[Martin, Frost, &c. vs. Greer & Connally, Ex'ors.]

fore such change. An abuse of a trust can confer no rights on the party abusing it, or on those who claim in privity with him.—*Idem.* 502. Now, if the money had remained vested in the land for which it was first given, this would not have divested the *Martin* children of their interest in it, and if so, does not the doctrine apply much more forcibly when the land is exchanged for a negro woman, in accordance with the terms of the original agreement, and when that negro was, by *Buckley* himself, placed in the room and stead of the negro woman *Nance,* to be held and enjoyed upon the same terms and conditions? Then, in order to ascertain what kind of estate *Buckley* and complainants respectively had in the negro woman *Jinny* and her increase, we must not look to the conveyance from *Pollard,* (the person from whom *Buckley* bought her,) to *Buckley,* but we must look to the conveyance of the negro woman *Nance,* from *Langdon* to *Buckley* and his wife, for it will be recollected that when *Nance* was returned, the $400 were advanced in lieu of her to purchase another negro woman, to be held upon the same conditions, and after the negro woman *Jinny* was purchased by *Buckley,* it is in proof that she was placed by him in the room and stead of *Nance,* and to be held in the same way. Then, what kind of estate did *Buckley* have in *Nance?* Was it not a life estate, and did not the *Martin* children have an estate in remainder, limited to take effect and be enjoyed after the determination of such life estate? Did it not pass out of the grantor, *Langdon,* at the time of the creation of the particular estate? and did it not vest in the grantees, the *Martin* children, upon the very instant that *Buckley's* life estate determined? If so, according to the allegations in the bill, they had the same kind of estate in *Jinny* and her increase, for she was purchased with the money advanced in lieu of *Nance,* and placed in her room and stead. But it is contended, that whenever *Buckley* was guilty of a breach of his trust, by a misapplication of the trust money in the purchase of the land with it, instead of the negro woman, that he was liable to be sued for the money, and that not having commenced said suit within the time prescribed after they arrived at full age, that their right to do so was barred by the statute of limitations, and that not having sued for the money at that time, they cannot now maintain a suit for the property purchased with the money. Perhaps this may be true if the money had remained vested in the land and a suit had been commenced for the recovery of the money;

but there is very great doubt in my mind, whether if a suit had been commenced for the recovery of the money, under those circumstances, the statute would have been a bar until after demand made of the money. In the case of *Lever* vs. *Lever*, 1 vol. *Hill's* Ch. Repts. I find this doctrine laid down by Judge HARPER: "We concur with the Chancellor that when there is a concurrent remedy in Law and Equity upon the case made, the limitation is the same in both Courts, and the present case is to be considered as at Law, but at Law the statute does not begin to run until there is some usurpation of the claimant's right and a cause of action has arisen. The possession of an agent or bailee (and a bailment is a trust) is the possession of the bailor or principal and is not adverse till demand made. In the case of a simple deposit of money, to be left for the depositer or to be paid according to his direction, there is no cause of action till a demand be made or an account stated, and the statute does not begin to run till then." And even if the money had remained vested in the land until after the *cestui que trust*s came of age, they had the right to make their election and sue for the money, or to claim the land as having been purchased with their money. "If the trustee be guilty of wrongful conduct, he does not cease thereby to be trustee, and of the same kind of trust as before such conduct, but it is at the election of the *cestui que trust*, to consider the trust at an end if he chooses, and treat the trustee as a wrong doer."—2d vol. *Barbour & Harrington's* Eq. Digest 496, which cites the case of *Falls* vs. *Torrence*, 4th *Hawk.* 413. But it must be recollected in this case, that before the complainants arrived at full age, and before any suit was brought for the money, that *Buckley*, in 1812, exchanged the land for a negro woman, in accordance with the original agreement, there was then no cause of complaint against him at the time the children came of age, and therefore no necessity for commencing a suit, but if a suit had been commenced, *Buckley* could have replied, I have complied with my contract, I have purchased a negro woman and placed her in the room and stead of *Nance*, and by the terms of the agreement, I am entitled to her during my life, and at my death, and not till then, will your right accrue. He might have added farther, it is true I did not do it immediately, nor was I required to do so by the contract, I have done it as soon perhaps as was convenient, and in ample time to secure all of your rights under the agreement, therefore you have no cause of

[Martin, Frost, &c. vs. Greer & Connally, Ex'ors.]

action against me. Would not this have been a full and complete answer and defence to such suit? I am therefore clearly of opinion, that according to the original agreement, *Buckley* had a life estate, and a life estate only, in *Nance*, and that when *Jinny* was purchased and placed in her stead, he had the same estate in her and no more, and that the fact of his having taken the title in his own name, cannot alter or affect the rights of the parties in any manner, except so far as the remedy is concerned, or the course proper to be pursued to obtain those rights. *Buckley* being tenant for life, must be, and is considered by the authorities, as a trustee. See *McCord's* Ch. Rep'ts. 1 vol. 227. "Tenant for life and his privies are trustees for the remainder man." Also *Fearne* 414, and as above quoted from STORY's Equity, an abuse of a trust by taking the title in his own name, can confer no rights on the party abusing it, or those who claim in privity with him. This disposes of the second ground.

The third ground is: because the Court charged the Jury, that the statute of limitations did not commence running against the complainants, in favour of defendants, until the time of the probate of the will of *Buckley* by defendants. In order to determine whether the Court erred upon this point, it will become necessary to go into the examination of the various kinds of *trusts*, the nature of the trust estate which *Buckley* held, and the rights conferred upon his executors by reason of their having acquired such estate as executors. Trusts are first divided into express and implied trusts. "*Express trusts*" (says Judge *Story*, 2 vol. 243) "are those which are created by the direct and positive acts of the parties, by some writing, or deed, or will," and he defines implied trusts to be "those which are deducible from the nature of the transaction as matter of clear intention, although not found in the words of the parties," "or which are superinduced upon the transaction by operation of Law, as matter of Equity independent of the particular intention of the parties." The latter of which, he says, comprehends all those trusts which are called constructive and resulting trusts. Trusts are again spoken of in many of the authorities as direct trusts, as contradistinguished from possible or eventual trusts. In FONBLANQUE's Equity, I find this authority: "*Direct trusts* are such as are created and acknowledged by the act of the parties. Possible or eventual trusts occur where a party who took possession originally in his own right, and was *prima*

*facie* the owner, is afterwards converted into a trustee, by evidence." Again, in the case of *Kane* vs. *Bloodgood*, the Chancellor says : " Every deposit is a direct trust ; every person who receives money to be paid to another, or to be applied to a particular purpose, to which he does not apply it, is a trustee, and suable either in Law or Equity. The several contracts of bailments which, according to Sir WILLIAM JONES, " are amongst the principal springs and wheels of civil society," are cases of express and direct trusts. It will be perceived then, from these authorities, that it is not essential to the creation of a direct or even an *express trust,* that it should be in writing, except it be in relation to real estate, where it is made so by the statute of frauds. Then what kind of trust is the *trust* made by the complainants in this bill ? Direct *trusts* are such as are created and acknowledged by the act of the parties. Then, most clearly, the contract of the parties in relation to the negro woman, *Nance,* and also in relation to the $400, advanced in lieu of her, constituted a direct trust ; then according to the doctrine already referred to in STORY's Equity, " that if any property in its original form is converted with a trust in favour of the principal, no change of that state and form can divest it of such trust." The same position will hold good as to *Jinny* and her increase. The only thing that would give it the appearance of resulting trust, being the circumstance of the titles having been taken in the name of *Buckley.* It is true, that upon the execution of the title to *Buckley* for *Jinny* and her children, a trust did result to the complainants ; but it may more properly be considered the tracing or following out the trust estate, previously created by the act of the parties. But perhaps it is not necessary to examine this question further, the main question being not whether this be a direct or implied trust—but whether it be such a case of trust as may be barred by the statute of limitations ; and this is not the proper criterion by which to distinguish as to this matter, for executors and administrators are only constituted trustees by implication. Yet it is laid down in all the authorities, that no lapse of time will bar a legacy. What then is the rule by which we are to distinguish between cases in which the statute is a bar, and in which it is not ? Upon a careful examination of the authorities, I think the rule will be found to be this : that the trusts which are not within the statute, are those which are creatures of the Court of Equity, and not within the cognizance of a Court of Law. It is laid down by

[Martin, Frost, &c. vs. Greer & Connally, Ex'ors.]

many authorities, as a general rule, that no lapse of time will bar a direct *trust*, as between a trustee and a *cestui que trust*; and this is the doctrine laid down as a general proposition, in the case of *Decouche* vs. *Savitier*, 3d *Johns*. Ch. Rep'ts. 190. But in the case of *Kane* vs. *Bloodgood*, (7th *Johns*. Ch. Rep'ts. 110, where all the cases on the subject are reviewed,) Chancellor KENT, when speaking of the various cases of trusts, and of the propriety of withdrawing all such cases from the operation of the statute, says: "A review of the decisions will enable us, as I apprehend, to deduce from them a safer and sounder doctrine, and to establish upon the solid foundations of authority and policy, this rule that the trusts intended by the Courts of Equity not to be reached or effected by the statute of limitations, are those technical and continuing trusts which are not at all cognizable at Law, but fall within the proper, peculiar and exclusive jurisdiction of this Court." And Chief Justice SPENCER, when delivering his opinion in the case of *Murray* vs. *Coster*, 20th *Johns*. Rep'ts. 375, speaking upon the same subject, says: "I have, therefore, no hesitation in saying, that in a case where there is a concurrent jurisdiction in the Courts of Common Law and Equity, the rule must be the same, and the statute of limitations may be pleaded with the same effect in the one Court as the other, in cases of trusts and fraud, peculiarly, appropriately and exclusively, the objects of Equity jurisdiction, and according to the established doctrine the statute cannot be pleaded." I would, then, ask, is not the case before the Court such a case? It must be obvious to the most superficial observer, that a common Law Court could have no jurisdiction in this case. In fact I have been informed that this bill was demurred to, for the want of Equity, and upon the ground that the complainants had a Common Law remedy, and my predecessor, as I think, very properly overruled the demurrer, thereby establishing the position, that, according to the allegations contained in the bill, the complainants had no Common Law remedy. In the case of *Decouche* vs. *Savitier*, (3 *Johns*. Ch. Rep'ts. 216,) the Chancellor says: "There is a class of cases which admits a reasonable time to be a bar, but these are cases in which a party is turned into a trustee by matter of evidence merely, and took possession originally in his own right, and was *prima facie* the owner." But, I would ask, is this a case falling within this class of cases? Is *Buckley* turned into a trustee, by matter of evidence merely? or was he so constituted by the con-

tract and agreement of the parties, under which he received the negro woman, *Nance?*—and it must be borne in mind that *Jinny* was placed in her stead. Did he take possession of *Nance*, originally, in his own right?—or we might make the same inquiry as to *Jinny*, whom he admitted he had bought and placed in the room and stead of *Nance*. But, suppose this to be such a case of trust as is not exempt from the operation of the statute, are the facts such as to protect these defendants from its operation? I think it has been clearly shewn that *Buckley* had only a life estate in this property with remainder in fee to the complainants. Then, according to the authority already referred to in the case of *Swan* vs. *Ligon*, tenant for life and his privies are trustees for the remainder man. The executors of *Buckley* stand in the same relation to the complainants, as to this property, that *Buckley* did himself, and so long as they hold it, the statute can no more run, than if the property were still in the possession of *Buckley*. They set up no distinct title to the property, but claim it as his executors ; therefore their possession is referred to his title, and to enable a party to plead the statute of limitations, there must be an adverse possession. Suppose that *Buckley*, instead of having a life estate in the property, had had an estate for ten years only, with remainder to the *Martin* children, and at the expiration of the ten years no demand had been made for the property, and he had continued in the peaceable possession of it for ten years longer, and had then refused to give it up, could he have then pleaded the statute of limitations successfully? I think not. This doctrine is fully sustained by the opinion of Lord MAC-CLESFIELD, in the case of *Lockey* vs. *Lockey*, as referred to in the case of *Kane* vs. *Bloodgood*, 7th *Johns*. Ch. Rep'ts. 121, in which his Lordship says, " If the trustee is in possession and does not execute his trust, the possession of the trustee is the possession of the *cestui que trust*, and if the only circumstance be that he does not perform his trust, his possession operates nothing as a bar, because his possession is according to his title. As in the case of lessee for years, though he does not pay his rent for 50 years, his possession is no bar to an ejectment, after the expiration of his term, because his possession is according to the right of the party against whom he seeks to set it up." If *Buckley* could not have pleaded the statute, can his executors who represent him, and claim under his title? No, in the language of Chancellor KENT, in the case of *Decouche* vs.

[Martin, Frost, &c. vs. Greer & Connally, Ex'ors.]

*Savitier*, 3 *Johns*. Ch. Repts. 214, "The person to whom letters of administration were granted, succeeded to the possession of the property not in her own right, but expressly as trustee for the party having right, it would be unjust for the person who takes possession of the property of the intestate under the authority of Law *qua* administratrix to be at liberty after six years' possession, to set up the statute of limitations as a bar, to the *cestui que trust.*" This doctrine is fully sustained by the Supreme Court of Alabama, in the case of *Maury's adm'rs* vs. *Mason's adm'rs*, 8th *Porter's* Repts. 211, and in delivering the opinion of the Court, the Judge quotes the opinion of Judge Story, in the case of *Trecothick* vs. *Austin*, 4th *Mason* 16, where he observes, " executors are charged with no more in virtue of their office, than the administration of the assets of their testator ; if at the time of his death, there is any specific personal property in his hands belonging to others, which he holds in trust or otherwise, and it can be clearly traced and distinguished from the testator's own, such property, whether it be goods, securities, stock or other things, is not assets to be applied to the payment of his debts, or to be distributed among his heirs, but it is to be held as the testator himself held it." And again he remarks, " if the trust is still subsisting in the hands of the executor the lapse of five years (that being the limitation there) does not bar a remedy against him." And in the case of *Lever* vs. *Lever, Hill's* S. C. Rep'ts, 1 vol. 67, before referred to, Judge HARPER lays down the doctrine, that where there is a concurrent remedy in Law and Equity, the limitation is the same in both Courts, but that even at Law the statute does not begin to run until there is some usurpation of the claimant's right, and also that the possession of the bailee is the possession of the bailor, and is not adverse till demand made, and the statute does not begin to run till then. In *Barbour & Harrington's* Digest, in which the case of *Falls* vs. *Torrence*, 4 *Hawk.*, is referred to, I find this doctrine laid down : " In cases of direct and pure trusts, time has no influence. The estate of the trustee is that which supports the trust, and without which it could not exist, and his possession operates for the benefit of the *cestui que trust.* The trustee cannot by any act of his, make his estate and possession adverse to the *cestui que trust.* The trust owes its existence to agreement, and it requires the consent of the parties to destroy it." The case of *Collier and Wife* vs. *Poe*, 1 vol. *Devereux* N. C. Rep'ts. 55, is a very

strong case upon this point. In that case, *James Paine*, the grand-father of *Elizabeth Collier*, one of plaintiffs, on the intermarriage of *Poe*, the defendant, with his daughter, put into their possession sever-al negroes, as a loan, during his pleasure, and not as a gift. This was in the year 1804. The wife of the defendant had issue—the plaintiff, *Elizabeth*—and immediately thereafter died. *Paine* died about the 4th of December, 1807, having first made his will, and bequeathed the negroes to the defendant for 18 years, and then di-rected them to be divided between the plaintiff *Elizabeth* and her father the defendant, the moiety of defendant to be retained by him during his life, and after his death to vest in her. The bill then set forth the marriage between the plaintiffs, and charged that defendant had denied their title, had sold some of the negroes and had threat-ened to sell others, that defendant was possessed of but little proper-ty, and the plaintiffs believed, would remove all the negroes beyond the State. The plaintiffs prayed a special writ, &c. The answer of defendant denied the loan, and insisted upon the delivery of the negroes as an advancement to defendant's wife, and alleged that de-fendant had always held and claimed the negroes as his own proper-ty, that when some report was circulated of the claim now set up, he had openly and publicly announced his title, had for more than three years before the death of *Paine*, and ever since, continued in adverse possession of the slaves, and insisted on the statute of limi-tations. It appeared in proof, that when the negroes were about being sent to the house of defendant, by *Paine*, he did declare to his daughter, that they were lent during his pleasure, and were not de-signed as a gift. But it did not appear that the defendant was pre-sent, and it was also in proof, that defendant always claimed title to the negroes, that he made it known and held them as his own, in op-position to the title now set up. HENDERSON, Judge, in delivering the opinion of the Court, says, "As to the statute of limitations re-lied on, in the answer, there is no pretence for its operation, either in Law or Equity, the possession of the defendant was that of a mere bailee, notwithstanding his declarations that he claimed them as his own, he could not by his own act throw off his character of bailee." Upon the application of the foregoing authorities to the case before the Court, I am clearly of opinion that the defendants can not protect themselves by the statute of limitations, even admit-ting that this is such case as in which the statute might be a bar,

because their possession is not adverse, being nothing but a continuance of the possession of *Buckley*, which was in accordance with the agreement, and consistent with the right of complainants, and also because their possession could not be adverse until demand made. The Court is therefore of opinion, that if it erred in charging the Jury that the statute did not commence running until after the probate of the will of *Buckley*, the error was in *this*, that it was thereby deciding that the statute did commence running from that time, which the Court does not now believe, and being favorable to the defendants, it is a matter of which they have no right to complain.

Fourth ground. Because the Jury have returned a verdict in favour of *Joseph Frost* and wife, who have been made parties by an amendment, who claim to be entitled to one-fifth of the property in controversy, without there being any evidence going to shew he had commenced any suit for his share of said property against the defendants, until after the expiration of four years from the time of the probate of the will of said *Buckley*, so as to take the case out of the statute of limitations as to him   The position occupied by defendants' counsel upon this ground is this, that the bill which was filed in the year 1835 by *John L. Martin*, who states that he was the assignee of *Frost* and others, can not prevent the operation of the statute so far as *Frost* is concerned, because they say that on the trial *Martin* could not shew an assignment of *Frost's* interest, and therefore his interest cannot be considered as having been sued for, and that there was no action commenced as to him, or for his interest, until he was made a party by an amendment to the bill filed in 1839. If this be true that *this* was no suit as to him, then, there being no evidence to shew that any demand had ever been made for his interest, and it being necessary that there should be a demand made, to constitute the possession of defendants adverse according to the authorities already cited, it will be perceived, that the authorities relied on as to the third ground, are equally applicable to this—first, that it is a case in which there is no Common Law remedy, and therefore, being a case of trust, falling peculiarly and exclusively within the cognizance of a Court of Equity, the statute of limitations is no bar—secondly, that if it were a case in which the statute could be pleaded, (which can only be done where the Courts of Law and Equity have concurrent jurisdiction,) that the statute has

not run against the complainant because there is no adverse possession.

The fifth ground is: Because defendants are sued by complainants as the executors of *Hiram Buckley*, deceased, and required to account for property held and possessed in their representative capacity, and the Jury have refused to allow them credit for their disbursements as rendered in their answer, which disbursements had been allowed and sanctioned by the Court of Ordinary of De Kalb County, and were not contradicted by any testimony. As to this ground, it must be recollected, that the suit was not brought by the complainants as the legatees of *Hiram Buckley*, and do not therefore claim the property as belonging to his estate; if so, there would be no doubt that the returns made by the defendants as executors of said estate, being uncontradicted, ought to be allowed; but if complainants were entitled to the negroes as their own property immediately on the death of *Buckley*, they were also entitled to the hire of said negroes, after deducting therefrom the amount expended for the use and on account of said negroes; but there is no reason why the hire of said negroes should be applied to the payment of the debts of said *Buckley*, they should be paid out of the estate of *Buckley* proper. It will be found by reference to said returns, that the hire of the negroes, the subject of the suit, amounts to the sum of $3157, and the interest on the same amounts to the sum of $824, making together the sum of $3981, and the Jury found the sum of $2557 for hire, which leaves a balance of $1424 of the hire and interest which they did not find, the presumption is, that the Jury considered this amount sufficient to satisfy all the disbursements which had been made by said defendants, on account of said negroes, and this being a matter proper for the Jury to determine, and the allowance appearing to be sufficiently large, the Court cannot therefore disturb the verdict on this ground.

The sixth and last ground is: Because the Jury found contrary to Law and evidence. The Court has endeavoured to shew, that the verdict is not contrary to Law, and it was the peculiar province of the Jury to determine the facts to which the Law was applicable, and the evidence being conflicting as to some of the important facts of the case, the Court can not take upon itself to say that the ver-

[Martin, Frost, &c. vs. Greer & Connally, Ex'ors.]

dict was contrary to evidence. The motion for a new trial is therefore refused.

WILLIAM EZZARD, J. S. C. C. C.

WARNER & FOSTER, for the motion.
COLQUITT, RAY, CALHOUN & CLARKE, contra.