JOYNES, J.
The counsel for the appellants contended that the answer of Mrs. Cabell°in the case of Steedman v. Cabell & als. which is offered in evidence against them, does not operate as an estoppel upon the appellants in this case; and I concur in that position. That answer can have no other effect in this case than as an admission or declaration of Mrs. Cabell under whom the appellants claim, and as in.the case of every other declaration or admission not made in the pleadings in the cause, the weight to which it is entitled must be ascertained by considering all the circumstances connected with it. Thus, it would be competent for the appellants to show that Mrs. Cabell misapprehended the import of the answer, or that she made the statement relied upon from imperfect or erroneous information or recollection of the facts, or incautiously and without due attention. Whether , a party, or those claiming under him, would be allowed to avoid the effect of his answer in another cause by showing that it was wilfully false, and so made for some sinister purpose, or with a view to some “pious fraud,” as may be inferred from the books cited by the counsel for the appellants, is a question w^ich does not arise upon the facts of this case, and need not, therefore, be considered. Vide Grounds and Rudiments of Law and Equity 134, pl. 4; Whitehorn v. Edwards, 1 Ch. Rep. 173; Jones v. Lenthall, 1 Ch. Ca. 154; Smith v. Palmer, Ibid 133.
It was, therefore, competent for the appellants to show, as they have done, that it is not true, as stated in Mrs. Cabell’s answer in Steedman v. Cabell & als., that Eucinda was sold at the sale of Eandon Cabell’s estate, but that in point of fact she had been put into the possession *of Mrs. Cabell before the date of that sale, and so remained for several years.
And so I think the position assumed by the counsel for the appellants, that the appellants are not concluded by any admission in the ansurer of Mrs. Cabell in that case, in respect to the legal rights of her children after her death, is a sound one. “A party is not bound by his statement of the legal consequences of the 'facts stated by him. It is for the court to judge what are those legal consequences.” Per Lord Cottenham in Brown v. Newall, 3 Milne & Craig’s R. 558, 576. If, therefore, it would not follow as a legal consequence from the facts stated in that answer, that Edward and Matilda would, upon the death of Mrs. Cabell, pass to her children in lieu of Eucinda, the appellants are not concluded by the admission of Mrs. .Cabell that they would so pass.
The passage in Mrs. Cabell’s answer in Steedman v. Cabell & als., which is relied on by the appellees in this case to prove that Edward and Matilda had been substituted for Eucinda, is in the following words: “The defendant has not now, nor had she at the time of the service of the subpoena in this cause, any property or effects in her hands belonging to her co-defendant Eandon R. Cabell, except his interest in the library and negroes hereinafter mentioned. By the will of the defendant’s husband Eandon Cabell deceased, there were devised to her for life, with remainder to her three children, the following slaves, to wit: Burgess, a man; Jordan, a man ; Cyrus, a man; Margaret, a woman ; Eucinda, a girl; and Charity, a girl. At the sale of the testator’s estate the girl Eucinda was sold, and in her stead this defendant purchased two small negroes, Edward and Matilda, the children of the above named woman Margaret. This was done by consent of parties, to prevent a separation of . families. In these slaves the said *Eandon R. Cabell, after the death of this defendant, will be entitled to an undivided equal third part.”
The position of the counsel for the appellants is, that Mrs. Cabell only intended to put Edward and Matilda in the place of Eucinda, and afterwards changed her mind; or that, at the most, she made an offer to her children to do so, which they did not accept, and which she was therefore at liberty to withdraw; and that no such substitution could be made so as to be binding on Mrs Cabell without the consent and agreement of her children, who were entitled in remainder after her death.
I do not think it possible to read the extract which has just been quoted from Mrs. Cabell’s answer in Steedman v. Cabell, without understanding from it that Eucinda had been sold so that she would be lost to the remaindermen; in other words, that she was sold in absolute property: that this had been done by Mrs. Cabell: that she intended that Edward and Matilda, two of her own slaves, should take the place of . Eucinda, and understood that an arrangement to that effect had already been completed: and, besides, that all this hadbeen done by “the consent of parties.”
The counsel for the appellants, however, contend that the case must be decided upon the facts as set forth in the answer of Samuel D. Williamson, for the reason that no replication was filed to' that answer. ■ But I do not think the appellants can derive any advantage from that circumstance. *315 The answer of Williamson does not deny that Eucinda was sold by Mrs. Cabell, and though it surmises that the sale of Eucinda' may have been for the life of Mrs. Cabell only, it does not affirm it, nor does it deny that Mrs. Cabell intended that Edward and Matilda should stand in the place of Eu-cinda, and understood that an arrangement to that effect had been fully made and perfected. The only positive averment made in that ‘answer is, that there was no contract between Mrs. Cabell and her children for the substitution of Edward and Matilda for Eucinda, by which they agreed to give up their claim to Eu-cinda, or her value, in consideration of her putting Edward and Matilda in her place. But this is a matter of which the respondent could have had no personal knowledge. He had nothing to do with the transaction ; and the record contains evidence that he did not marry into the family of Mrs. Cabell until more than ten years after it took place. (See deed April 9, 1849, from Mrs. Cabell to trustees for Miss Preston, afterwards Mrs. Williamson.)
Recurring then to Mrs. Cabell’s answer in Steedman v. Cabell & als., it affirms, as already stated, that the substitution of Edward and Matilda in the place of Eucinda was made “by consent of parties.” What is this but an admission by her that the pa.rties entitled in remainder had agreed to accept Edward and Matilda in place of Eu-cinda, and to relinquish their claim to her or her value, in consideration of the substitution, and that the arrangement was concluded and settled? The appellants who claim under her must be bound by this admission unless they can clearly establish that it was made under some mistake. It was certainly natural that Mrs. Cabell should consult her children about such an arrangement, and there is every reason to suppose that they would assent to it, not only for the reason stated by Mrs. Cabell, but also because it appears from the evidence that Edward and Matilda were of much greater value than Eucinda.
It cannot be said, after the decree in Steedman v. Cabell & als., that the substitution was incomplete as respects the interest of Eandon R. Cabell. That decree established his interest in all 1he slaves enumerated in the answer of Mrs. Cab-ell, including Edward and Matilda, *and the appellants are concluded by that decree. If Robert H. Cabell and Mrs. Preston, who were also parties to that suit, were entitled to claim the benefit of that decree as an adjudication in their favor, it of course concludes this whole case. But I am considering the case upon the hypothesis that they were not so entitled.
The only effect of the consent and agreement of the remaindermen to the substitution in question, would be to preclude them from setting up a claim to Eucinda or her value, and thereby to conclude a contract with Mrs. Cabell. And that would, no doubt, be necessary to entitle them to recover the substituted slaves in a court of law. Vide Hunter v. Jones, 6 Rand. 541.
But if we consider that there was no such contract in this case, it remains to be seen whether the claim of the appellees cannot be sustained on other grounds.
It cannot be disputed that Mrs. Cabell, in her answer in the case of Steedman v. Cabell & als., regarded the slaves Edward and Matilda as being no longer her absolute property, but as being property in which she had an estate for life, and her children an estate in remainder after her death. In other words, these slaves having been originally her absolute property, she had elected to hold them as her own for life, remainder to her children, in the place of Eucinda, whom she had sold. This was a declaration of trust, which was valid against Mrs. Cabell, without any assent on the part of the remaindermen, and which she had no power to revoke.
It is not material when this declaration was originally made, or in what form of words, or whether it was in writing or not. It is enough that it appears clearly from her deliberate declaration, that she had made such an appropriation of these slaves, and that she then considered them as property that had ceased to be hers absolutely, and had become hers for life only, with remainder *to her children. The law on this subject is thus stated by Spence: ! ‘It is not necessary that there should be any transfer of property accompanying the declaration of trust, whether the fund be in the possession of the donor or of another; the property may still remain as it was, and the donor may constitute himself or the possessor trustee of the fund ; and in such case it is not necessary that the donor should expressly declare himself to be trustee; if he do any act in relation to property to which he is legally entitled, though without reference to the creation of a trust, from which it plainly appeal's that he considered that the property, though legally vested in him, had ceased to be his, and had become the property of another, those acts may amount to a sufficient declaration that the donor holds the property in trust, so as to be binding upon him.” 2 Spence’s Eq. 53. The case of Thorpe v. Owen, 5 Beav. R. 224, affords a pertinent illustration of this doctrine. The mother of Henry Owen by her will gave her personal estate to his six daughters, and appointed him her executor. He converted the whole personal estate into money, and invested it, together with ,¿1,000 of his own money, in his own name. He made payments to some of his daughters as they became of age of their shares of the aggregate fund, the ¿¿1,000 included, and otherwise admitted that the whole sum was held by him in trust for his daughters. It was held, after the death of Henry Owen, that a trust had been effectually declared of the ¿¿1,000 in favor of the daughters.
In this view of the case, the property in Edward and Matilda had, in the view of a court of equity, passed out of Mrs. Cabell *316 except for the term of her life, and those in remainder had not given up their claim to Lucinda or her value. But as the object of Mrs. Cabell was only to make a substitution, the remaindermen could not assert a *claim both to Lucinda or her value, and to the slaves who were put in her place.
But even if the property in Edward and Matilda, after the death of Mrs. Cabell, had not passed out of her, upon the grounds which have been considered, I think that the claim of the appellees may be maintained on other principles.
In the view of a court of equity, Mrs. Cabell as tenant for life of the slaves bequeathed to her for life, remainder to her children, was regarded as a trustee. Fearne on Rem. 414; Swann v. Ligan, 1 McCord’s Ch. R. 227; Martin v. Greer, 1 Georgia Decisions 109. The sale of Lucinda was a breach of trust if the remaindermen did not consent to it, and upon the well settled principles of equity, the parties entitled in remainder after her death had a right, as cestuy que trusten, at their option, if nothing more had happened than the sale of Lucinda, to assert their claim to her in the hands of the purchaser,' or to hold Mrs. Cabell responsible to them for her value. If Mrs. Cabell had invested the proceeds of the sale of Lucinda in the purchase of another slave, they would have had the right, at their option, to claim the slave thus purchased with their funds. Adams’ Eq. 142-3; Hill on Trustees 91; lb. 522.' And if the specific application of the funds could not be traced, they would have been at liberty to prove it by clear admissions of Mrs. ■Cabell. Or if Mrs. Cabell had,'after the sale of Lucinda, purchased another slave of about the same value, and had held and treated the slave so purchased as one of those held by her for life, it would have been presumed that the purchase was made with the money arising from the sale of Lucinda. Hill on Trustees 522; Lewin on Trusts 762. Mathias v. Mathias, 3 Jurist N. S. 429. Now in this case, Mrs. Cabell did not go into the market and purchase another slave in the place of Lucinda, but *she elected to hold two slaves already belonging to her, as part of the property held by her for life, to stand in the place and stead of Lucinda. Was this not substantially a purchase of these slaves for that purpose from herself? Was it not in substance and effect, and in every thing except the form, the same as if she had bought them from a third person? And ought she not to be regarded as having applied the money in her hands arising from the sale of Lucinda to the purchase of these slaves from herself, just as if she had bought them from any other person? The relief given to the cestuy que trusten in such cases is not on any ground of contract. The court, upon principles of equity, allows them to follow the fund into the property into which it has been converted, with the option to take one or the other. Turner v. Street, 2 Rand. 408; Oliver v. Picott, 3 Howard’s U. S. R. 333.
To entitle the appellees to relief on this ground, therefore, against Mrs. Cabell or those representing her, it was not necessary to show that there was an agreement between Mrs. Cabell and those in remainder, that there should be a substitution of Edward and Matilda for Lucinda. The relief does not proceed upon the ground that there was such a substitution, in the sense that the claim to Lucinda or her value was given up, and the claim to Edward and Matilda substituted for it.
The case of Denton v. Davies, 18 Ves. R. 499, relied on by the counsel for the appellants as conclusive of this case, seems to me to have very little bearing upon it. This, case is thus referred to in Lewin on Trusts. (Am. ed. 1858), p. 757: “Where a man borrows money for the purpose of purchasing an estate, and afterwards misapplies a trust fund in discharge of the debt so contracted, the transaction cannot be treated ■ as a purchase with the trust money. ’ ’ And again, p. 762: “Where a ^tenant for life with power to sell and invest in the purchase of other land, purchased lands with borrowed moneys, and many years afterwards sold the settled estates and applied the purchase money partly in discharge Of the debts thus contracted by him, it was held that the purchased lands could not be treated as liable to the trusts of the settled estates.”
These passages, which are cited by the counsel for the appellants, are sufficient to indicate the general character of the case. In that case, as in this, the property in question had been purchased long before the trust property was sold, and, of course, there could not be, in either case, an application of the trust fund to the original purchase. In that case, the only ground on which the court was asked to consider it an investment of the trust fund was, that the trust fund was applied to repay a debt incurred to make the purchase, when the defendant denied that the lands purchased were ever intended by him to be substituted for the lands sold. In the case now before the court, the subject was personal property, which could pass without deed, and the trustee who had sold the trust property declared that she had substituted other property for it, and then held that property subject to the trust. The case cited is, therefore, no authority for holding that a court of equity will not, in such a case as this, regard the money arising from the sale of the original trust property as having, by the act of the trustee, which she was perfectly competent to do, been virtually applied to the purchase of the substituted property.
In the case cited, the bill was filed by parties entitled in remainder, to subject the purchased estates to the trusts of the settlement, on the ground that the tenant for life, who had sold the settled estates under a power, had substituted them for the estates which he had sold. *The purchased estates had not been conveyed upon the trusts of the settlement, which was the only mode in which the substitu *317 tion could have been effected, and the master of the rolls held, upon the answer of the trustees and the proofs, that there had been no application of the trust money to thei purchase, no agreement by the trustee to substitute the purchased estates for the estates sold, no declaration of trust, and no representation to the plaintiffs that such a substitution had been made or would be, •on which the plaintiffs had acted, and that there was, therefore, no ground upon which the court could compel the defendant to •convey the purchased estates upon the trusts of the settlement.
The objection to the jurisdiction is not well founded. For though the executor of Tandon Cabell deceased mig-ht have been authorized to recover the slaves and to sell them for the purpose of division, according to Almond & wife v. Mason’s adm’r, 9 Gratt. 700, yet if he did not choose to do so, it was competent for the appellees to file a bill to recover them and to divide them among the parties entitled. Ambler & als. v. Warwick & Co., 1 Leigh 195; Code of Virginia, ch. 124, $ 1.
I have discussed this case thus fully in deference to the learned counsel for the appellants, who being dissatisfied with the decision announced at the last term, applied for a re-hearing. I am of opinion that the decree was rightly affirmed, and that a re-hearing should be refused. This opinion will be filed in lieu of that filed at the last term, as it discusses the case more fully.
MONCURE, P., concurred in the opinion of Joynes, J.
Decree affirmed.